IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:20-CR-135 |
| | ) | |
| v. | ) | Honorable Anthony J. Trenga |
| | ) | |
| ABEL AMBROCIO, | ) | Sentencing: August 4, 2021 |
| | ) | |
| *Defendant.* | ) | **Redacted pursuant to** |
| | ) | **18 U.S.C. § 3509(d)(2)** |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

Defendant Abel Ambrocio comes before this Court having been convicted of two counts of producing child pornography after he pled guilty to directing a woman located in another country to rape and molest two prepubescent children, a young boy and an older girl, and to photograph their injured bodies, all for his own enjoyment. As reflected in the Presentence Investigation Report ("PSR," ECF No. 66), the correctly calculated Guidelines sentence is life imprisonment capped at the statutory maximum of 720 months' imprisonment (and with a mandatory minimum term of incarceration of 180 months). For the reasons stated below, the United States requests that the Court sentence the defendant to the Guidelines term of imprisonment followed by a lifetime of supervised release. The United States also requests that the Court order him to pay full restitution to the victims as further described below, pay the special assessments set forth in statute, and forfeit any electronic devices used in connection with his crimes. Such a sentence is sufficient but not greater than necessary to reflect the gravity of the defendant's conduct and to meet the other 18 U.S.C. § 3553(a) sentencing factors.

## **BACKGROUND**

In 2018 and 2019, while the defendant's family was caring for him, he was posing as someone else on Facebook and cultivating an online relationship with a woman in Honduras. The relationship became sexual and the woman began sending him nude images of herself. She also shared with him that she had access to a young boy and girl. As the relationship developed, the defendant began to exercise significant influence over the woman. Eventually, he began demanding that she sexually abuse the children and send him images of this abuse. Based on the defendant's detailed orders, the woman created and sent the defendant hundreds of images of these children being sexually abused and degraded, including images depicting the woman repeatedly sodomizing the children with bananas. By February 2019, however, their online relationship soured. As revenge, the defendant sent nude images of the woman—and images of the woman sexually abusing the young boy at his direction—to another Facebook user, telling that user to look at what the woman does when men ask for naked pictures of her.

Due to the diligent efforts of law enforcement, the children—seen below in an image the woman sent in December 2018, in the middle of the offense conduct—have been rescued.



And while the woman appears to have fled and avoided arrest to date, the children's other abuser—the defendant—has been caught and now convicted of multiple serious crimes for the sexual abuse and trauma he inflicted upon them, as described further below.

## I.    Factual History

In March 2020, the Federal Bureau of Investigation's (FBI) Washington Field Office received information from the Fairfax County, Virginia Police Department (FCPD) that the defendant was being investigated for child pornography offenses. PSR at ¶ 16. FCPD's investigation began in June 2019, when the National Center for Missing and Exploited Children sent a cybertip advising that a particular Facebook account (Account 1) was distributing child sexual abuse images depicting mouth-to-penis and mouth-to-anus contact between an adult woman, Unindicted Co-Conspirator 1 (UCC-1), and a prepubescent boy (MINOR VICTIM 1), who appeared to be approximately four years old. PSR at ¶ 17. The images had been distributed to another Facebook account in March 2019, appeared to be taken together during a single instance of abuse, and appeared to be taken in another country.

FCPD obtained a warrant for the contents of Account 1 and confirmed that messages matching the text of the cybertip had been sent from Account 1. PSR at ¶ 18. Specifically, Facebook records show that the user of Account 1 sent child pornography images to the other account along with a Spanish-language message that translates to: "Look how she looks for men from her house, asking for naked pictures." *Id.* Access logs for Account 1 showed that the account had been consistently accessed from an IP address assigned to a residential address belonging to the defendant's next-door neighbors, who were unaware of the defendant's crimes. PSR at ¶ 19. The FCPD executed a search warrant at the neighbors' home, but the electronic devices seized pursuant to the warrant did not contain any child pornography or related material. PSR at ¶ 20.

Through interviews with the neighbors, the FCPD learned that the defendant used his neighbors' wireless internet connection.

On October 28, 2019, the FCPD conducted a consensual interview with the defendant at his home, during which the defendant gave a partial confession. PSR at ¶ 21. He admitted that he used the neighbors' internet and admitted that he had used Account 1, but he claimed that Account 1 belonged to a woman he met online—later identified as UCC-1—and denied knowledge of any images sent from the account. PSR at ¶ 21. The defendant identified three additional Facebook accounts that he used, including an account under a false identity (Account 2), which he described as the account he used to communicate with UCC-1, who lives in another country. PSR at ¶ 22. The defendant also admitted that he used his cellular telephone to access the internet, so the FCPD seized the telephone pending a search warrant for its contents. *Id.* The search of the telephone confirmed that the defendant used the phone to access Account 2. In addition, FCPD obtained the contents of Account 2 through a search warrant. These records contained thousands of messages between the defendant and UCC-1, who used another Facebook account (Account 3). PSR at ¶ 24.

In the messages, the defendant instructed UCC-1 to commit specific and horrific sexual acts with her two prepubescent minor children, a boy (MINOR VICTIM 1) and a girl (MINOR VICTIM 2). As those messages reflect, UCC-1 sent approximately 600 image files depicting the children's sexual abuse to the defendant, all at the personal direction—and indeed whim—of the defendant. PSR at ¶ 24. Many of the photos depict vaginal and anal penetration of MINOR VICTIM 2 with UCC-1's finger and/or a plantain, as well as the anal penetration of MINOR VICTIM 1 with UCC-1's finger and/or a plantain. PSR at ¶ 24. The pictures also depict the mouth-to-genital contact between UCC-1 and both children, simulated sexual intercourse, and MINOR VICTIM 2 posed to expose her nude vagina. PSR at ¶ 24. UCC-1 also sent the defendant non-

pornographic images of herself and both children. *Id.* The victims' youthfulness is apparent in the images sent by UCC-1, as is the fact that these children lived in poor conditions.

The messages accompanying the photographs of the abuse show that it was the defendant who personally ordered UCC-1 to use the victims for these sadistic sexual acts. The PSR highlights two conversations that are particularly heinous among the thousands of disturbing messages recovered in this case. For instance, on November 12, 2018, the defendant demanded that UCC-1, who had been sodomizing the young girl and sending him pictures of that conduct, to continue doing it even though it was hurting the child (PSR at ¶ 25):[1]

| AMBROCIO | Put it all in |
| AMBROCIO | come on put it in |
| AMBROCIO | I want her to like it more and more |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with a plantain] |
| UCC-1 | She says she can't take anymore |
| UCC-1 | [sends a voice message] |
| AMBROCIO | She can stand it, use more Vaseline |
| AMBROCIO | Do it |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with a plantain] |
| AMBROCIO | In the vagina too |

The defendant was not satisfied with this, however, and, ignoring the child's pleas to stop, demanded that UCC-1 further penetrate MINOR VICTIM 2's anus with the plantain:

| AMBROCIO | it has to pass more, do you understand |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with a plantain] |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with a plantain] |
| AMBROCIO | Just like that, put it all inside of her |
| AMBROCIO | Do it |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with a plantain] |
| UCC-1 | She doesn't want to anymore |
| AMBROCIO | Do it okay |

---

[1] The transcripts of these conversations were originally in Spanish and were translated into English.

| | |
|---|---|
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with a plantain] |
| AMBROCIO | Come on more |
| AMBROCIO | have her open that butt |
| AMBROCIO | Do it |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with a plantain] |
| AMBROCIO | Do it like that babe |
| AMBROCIO | Tell her that if she wants you'd put it all in her vagina where she would prefer it |
| UCC-1 | She says not in the vagina and that it's really hurting her |
| AMBROCIO | Then she needs to let it go in through the back |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with a plantain] |
| AMBROCIO | Like that come on all of it |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with a plantain] |
| AMBROCIO | more babe |
| AMBROCIO | put her on her knees and hands and have her open up well |
| AMBROCIO | and put it inside of her |
| UCC-1 | She says no more, she is crying |
| AMBROCIO | Just one more |
| AMBROCIO | But put her how I told you to |
| UCC-1 | She said just how she is but only one more and no more |
| AMBROCIO | Okay but I want you to insert all of it okay all of it |
| AMBROCIO | Do you understand |
| UCC-1 | Only as much as she can take |
| AMBROCIO | I said all of it okay |
| AMBROCIO | What's going on |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with a plantain] |
| UCC-1 | [sends a voice message] |
| AMBROCIO | Okay tomorrow then okay |
| AMBROCIO | Now you my love |
| AMBROCIO | If you look at that last picture |

The defendant demanded pictures of the damage that his abuse had caused and instructed

UCC-1 to continue abusing the child:

| | |
|---|---|
| AMBROCIO | But first I want to see how her anus ended up |
| UCC-1 | [sends an image of a close up of MINOR VICTIM 2's anus] |
| AMBROCIO | Okay |

| | |
|---|---|
| AMBROCIO | Kiss her and then put some vaseline on her |
| UCC-1 | Okay |
| AMBROCIO | And put it in her anus with your finger so the pain can start to go away |
| AMBROCIO | I want to see it when you put your entire finger insider of her anus okay |
| AMBROCIO | and tell her not to leave |
| UCC-1 | Done |
| AMBROCIO | Send me the picture |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 2's anus with UCC-1's finger] |

Two days later, on November 14, 2018, the defendant demanded that UCC-1 abuse the children again for his pleasure. PSR at ¶ 26. This time, the defendant instructed, he did not want to be bothered by the children's requests to stop:

| | |
|---|---|
| AMBROCIO | Okay do what I asked you to do |
| AMBROCIO | Masturbate |
| UCC-1 | Okay |
| AMBROCIO | I want audio, real audio okay |
| UCC-1 | Okay |
| AMBROCIO | [sends a "thumbs up" sticker] |
| AMBROCIO | And with [the children] too okay |
| AMBROCIO | Put it all in |
| AMBROCIO | And I don't want to hear anything about not wanting to okay |
| AMBROCIO | And send me whatever Antonio sends you okay |
| UCC-1 | Whenever he responds okay |
| AMBROCIO | [sends a "thumbs up" sticker] |
| UCC-1 | [sends an image of herself engaged in mouth to penis contact with MINOR VICTIM 1] |
| UCC-1 | [sends an image of herself engaged in mouth to penis contact with MINOR VICTIM 1] |
| UCC-1 | [sends an image of herself nude, straddling MINOR VICTIM 1 who is also nude, simulating sexual intercourse] |

The defendant specifically demanded that UCC-1 send him pictures of the abuse of MINOR VICTIM 1, which involved oral sex and digital anal penetration:

| | |
|---|---|
| AMBROCIO | [sends a "thumbs up" sticker] |
| AMBROCIO | Come on keep going |
| AMBROCIO | With the other stuff |
| UCC-1 | [sends an image of herself engaged in mouth to penis contact with MINOR VICTIM 1] |

| | |
|---|---|
| AMBROCIO | More do it |
| UCC-1 | [sends an image of herself engaged in mouth to penis contact with MINOR VICTIM l] |
| AMBROCIO | Suck it |
| AMBROCIO | I want to see what you suck out of his penis in your mouth |
| UCC-1 | [sends an image of herself pressing her mouth against the open mouth of MINOR VICTIM 1] |
| AMBROCIO | Have him suck you |
| AMBROCIO | Come on |
| UCC-1 | [sends an image file of MINOR VICTIM 1 engaged in mouth-to-vagina contact with UCC-1] |
| AMBROCIO | Open yourself up more |
| UCC-1 | Done |
| UCC-1 | [sends an image file of MINOR VICTIM 1 engaged in mouth-to-vagina contact with UCC-1] |
| AMBROCIO | How |
| UCC-1 | [sends an image of herself and MINOR VICTIM 1 nude on a bed] |
| AMBROCIO | Keep going with the other stuff okay |
| AMBROCIO | Put your finger inside of him |
| AMBROCIO | What's going on |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 1's anus with her finger] |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 1's anus with her finger] |
| AMBROCIO | All of it |
| AMBROCIO | All of it |
| AMBROCIO | Come on do it all |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 1's anus with her finger] |
| UCC-1 | [sends an image of herself penetrating MINOR VICTIM 1's anus with her finger] |

The Facebook records for Account 2 contained additional direct messages to yet another Facebook account (Account 4) in which the defendant, using Account 2, sent the images he received depicting the sexual abuse of MINOR VICTIM 1 and MINOR VICTIM 2 and other sexually explicit images of UCC-1 without additional message content. The defendant later confirmed for law enforcement that Account 4 was his "backup account," and that he was transferring the images to archive them for later use. PSR at ¶ 28.

On February 20, 2020, FCPD again interviewed the defendant at his home. The defendant identified UCC-1 as the woman described in the above conversations and admitted that he had participated in these conversations, but claimed that he was requesting the pictures because he did not believe—at least at first—that UCC-1 was actually raping and molesting the children. The defendant grudgingly acknowledged that the conversations had "escalated" even though he knew they were wrong and admitted that he intended to store some of the photos in Account 4. *Id.*

## II.     Procedural History

The defendant was arrested and charged by complaint with production and distribution of child pornography on May 18, 2020. PSR at ¶ 1. On June 18, 2020, a four-count indictment was filed, charging the defendant with two counts of production (and attempted production) of child pornography (Counts One and Two), one count of distribution of child pornography (Count Three), and one count of receipt of child pornography (Count Four). PSR at ¶ 2. On March 23, 2021, the defendant pleaded guilty pursuant to a plea agreement to the two counts of production. PSR at ¶ 3; ECF No. 62.

In the plea agreement, the parties agreed that if the defendant qualifies for a two-level decrease in offense level pursuant to U.S.S.G. § 3E1.1(a) and the offense level prior to the operation of that section is a level 16 or greater, the government would file, pursuant to U.S.S.G. § 3E1.1(b), a motion prior to, or at the time of, sentencing for an additional one-level decrease in the defendant's offense level. The plea agreement did not note agreement as to any other sentencing issues. The United States also agreed to move to dismiss the remaining counts pending against the defendant at the conclusion of the sentencing hearing.

<u>**SENTENCING ANALYSIS**</u>

To determine the appropriate sentence, the Court must consult both the Guidelines and the factors set forth in 18 U.S.C. § 3553(a). Although the Guidelines are advisory, "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *United States v. Booker*, 543 U.S. 220, 264 (2005)). Thus, a sentencing court must first calculate the applicable Guidelines range after making the appropriate findings of fact. *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Relying on that range as "the starting point and the initial benchmark," the sentencing court must then "consider all of the § 3553(a) factors" before imposing a sentence. *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

**I.      The Applicable Sentencing Guidelines for the Defendant's Offenses**

The PSR correctly calculates the adjusted offense level under the Guidelines for both Count One and Count Two as follows:

| Guideline | Offense Level |
|---|---|
| Base offense level (U.S.S.G. § 2G2.1(a)) | 32 |
| The material involved a prepubescent minor or a minor who had not attained the age of twelve years (U.S.S.G. § 2G2.1(b)(1)(A)) | +4 |
| The offense involved the commission of a sexual act or sexual contact. (USSG §2G2.1(b)(2)(A)) | +2 |
| The defendant knowingly engaged in distribution. (USSG §2G2.1(b)(3)) | +2 |
| The offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) an infant or toddler. (USSG §2G2.1(b)(4)) | +4 |
| For the purpose of producing sexually explicit material, the offense involved the use of a computer or an interactive computer service to (i) persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct. (USSG §2G2.1(b)(6)(B)) | +2 |
| **ADJUSTED OFFENSE LEVEL** | **46** |

The PSR notes that the two counts of conviction do not group, and therefore calculates the defendant's combined adjusted offense level as 48. PSR at ¶¶ 69-72. The PSR also enhances the defendant's adjusted offense level by five points under U.S.S.G. § 4B1.5(b)(1), which applies when a defendant convicted of certain sex crimes—including production of child pornography, in violation of 18 U.S.C. § 2251(a)—has engaged in a pattern of activity involving prohibited sexual conduct, for an adjusted offense level of 53. PSR at ¶ 73. The PSR then determines that the defendant's total offense level should be 43, which is the highest offense level under the Guidelines.[2] PSR at ¶ 76. The PSR calculates the defendant's criminal history category as a I, PSR at ¶ 80, resulting in a Guidelines sentence of life imprisonment capped by the statutory maximum of 720 months (*i.e.*, 30 years for Count One + 30 years for Count Two). PSR at ¶ 110. The United States agrees with this calculation.

The PSR also correctly notes that restitution of at least $6,000 is due to the victims in the case pursuant to 18 U.S.C. § 2259(b)(2)(B). *Id.*

## II.     The 18 U.S.C. § 3553(a) Sentencing Factors Warrant a 720-Month Sentence

In this case, careful consideration of the § 3553(a) factors confirms that the correctly calculated Guidelines sentence of 720 months' imprisonment—followed by lifetime supervised release, as well as the imposition of restitution, forfeiture, and the special assessments discussed below—is the appropriate sentence for the defendant's pattern of abuse-by-proxy, during which he repeatedly directed UCC-1 to sexually abuse very young children for his sexual pleasure.

---

[2] Because the defendant's adjusted offense level before this final reduction is 53, whether his offense level is decreased for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 is immaterial.  In either scenario, his total offense level will be reduced to 43.

## A. The Nature and Circumstance of the Offenses

Children who are victimized through the production of child pornography "undeniably suffer serious harm when they are used to create this type of material." *United States v. Wellman*, 663 F.3d 224, 232 (4th Cir. 2011). The experience of being sexually abused, "[l]ong-term studies" confirm, "is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc) (collecting authority). As the Supreme Court explained while addressing a constitutional challenge to the judgment entered against a man who raped his stepdaughter:

> the victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin. The attack was not just on her but on her childhood. . . . Rape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of long anguish that must be endured by the victim of child rape.

*Kennedy v. Louisiana*, 554 U.S. at 435 (citations to various studies omitted). Moreover, "[w]hen child pornography is produced in conjunction with the sexual abuse of children, . . . the harm to the child victims is magnified and perpetuated." *Id.* at 1208. "Such images are 'a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.'" *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *United States v. Ferber*, 458 U.S. 747, 759 & n.10 (1982)); *accord United States v. Accardi*, 669 F.3d 340, 345 (D.C. Cir. 2012).

The production of child pornography is a vile crime whose horror cannot be fully captured in words. In addition to the harm that it causes to the victims' bodies and minds, "[e]very instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note);

*accord United States v. Sherman*, 268 F.3d 539, 547-48 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children, "who must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," "suffer a direct and primary emotional harm when another person possesses, receives or distributes the material." *Sherman*, 268 F.3d at 547.

It is thus unsurprising that when one "[m]ention[s] the term [child pornography] to your average American[,] . . . he responds with immediate disgust and a sense of unease." *United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), *aff'd*, 669 F.3d 723 (6th Cir. 2012). But as the *Cunningham* court warned, "once it enters the legal system, child pornography undergoes sterilization . . . far beyond properly removing emotion from sentencing decisions." *Id.* "Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement." *Id.*

The defendant's crimes are revolting and incalculably serious. He repeatedly abused two small children for his own sexual gratification through a willing accomplice and a figure who knew the children trusted. He demanded that UCC-1 repeatedly penetrate and rape the children and photograph herself doing it, oftentimes with the children fully aware that the images were being captured. In fact, in several of the images, MINOR VICTIM 2 can be seen attempting to cover her face or turn away from the camera. As courts have repeatedly concluded, the sexual penetration of prepubescent children is "inherently sadistic" because such sexual acts are "likely to cause pain in one so young." *United States v. Johnson*, 680 F. App'x 194, 198 (4th Cir. 2017)

(ordinary meaning of terms applies to Guidelines enhancement) (quoting *United States. v. Corp*, 668 F.3d 379, 390 (6th Cir. 2012)).  And here, the defendant clearly knew that UCC-1 was hurting these children, yet continued to demand more. What is more, when the woman stopped producing images of this sexual abuse for him in February 2020, the defendant distributed this material to someone else and told this individual to look at what UCC-1 does for men when they ask for naked pictures, presumably as revenge for failing to comply with his demands and with utter disregard for the harm he was causing these children.

Indeed, the defendant's conduct has likely imposed a lifetime of suffering on these children. *See Kennedy*, 554 U.S. 468 (Alito, J., dissenting) ("Psychological problems [associated with childhood sexual abuse] include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide."). While the long-term effects of the abuse that he forced upon them cannot be known for some time, clinical research indicates that they will be significant. Researchers have concluded that adults who suffered sexual abuse as children are more likely to exhibit negative behavioral and mental-health issues as adults. *See* Shanta R. Dube, et al., *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28 AMERICAN JOURNAL OF PREVENTIVE MEDICINE 430-48 (2005). According to the findings of the Adverse Child Experience Study, which was based on data collected from more than 17,000 people in the mid-1990's, adults who experienced any kind of sexual abuse—whether it be sexual touching or attempted or completed oral, anal, or vaginal intercourse—are more than twice as likely to have attempted suicide than adults who experienced no childhood sexual abuse. *Id.* at 434 (Table 3). Those adults whose abuse consisted of actual or attempted intercourse are even more likely to have attempted suicide. *Id.* at 435 (Table 4). The percentage of adults who experienced

such abuse and who succeeded in their suicide attempts is, of course, unknowable. Similarly, women who suffered *any* childhood sexual abuse are 70% more likely to use illicit drugs and 60% more likely to have problems with alcohol. *Id.* at 434 (Table 3). Those percentages increase when the abuse involved actual or attempted intercourse. *Id.* at 435 (Table 4).

In short, the defendant's criminal conduct will redound to these children's detriment in profound and long-lasting ways. He has likely burdened them with a lifetime of suffering. And, as was readily apparent in the images created when the defendant demanded that UCC-1 abuse them, these children likely lack easy access to the kinds of resources that would help them cope with their suffering.[3] The Court's sentence should take into account the lifelong burdens that these children will likely experience as a result of the defendant's crimes and sentence him to a Guidelines-compliant term of imprisonment.

B.    **The Need for the Sentence to Reflect the Seriousness of the Offenses, to Promote Respect for the Law, and to Provide Just Punishment**

"There can be no keener revelation of a society's soul than the way in which it treats its children." *Cunningham*, 680 F. Supp. 2d at 847 (attributing quote to Nelson Mandela). Sadly, "[t]he exploitation of children is pandemic. The most vulnerable members of our society have been exploited and discarded." *Id.* at 848 (citation omitted). To reflect the seriousness of this crime, those who participate in this conduct must be punished severely. *See United States v. Morace*, 594 F.3d 340, 350 (4th Cir. 2010) (citing a 2003 legislative enactment as "ample evidence of Congress's intent that offenses involving child pornography be treated severely").

Indeed, as detailed above, the victims in this case have already been subjected to a lifelong scar worse than any punishment the defendant could now receive. The Government requests that

---

[3] Although the children have been rescued, the United States' efforts to make contact with them throughout this case have proven difficult due to COVID-19 and their location in another country.

the Court impose a sentence that reflects the likely impact of the crimes on the victims, which in this case is a Guidelines sentence. Such a sentence is necessary to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment.

> ### C. The Need to Afford Adequate Deterrence to Criminal Conduct, to Protect the Public from Further Crimes of the Defendant, and to Provide the Defendant with Treatment

The sentence in this case must constitute a loud message to potential child sexual offenders that severe consequences will result from such heinous acts, even when the victims are located in another country. Although it is not entirely clear why the defendant thought he could carry out these crimes without punishment, it is likely that he thought that his use of a false identity on social media, his neighbors' wireless internet connection, and the lack of a financial paper trail made his actions undetectable. It also seems likely that because MINOR VICTIM 1 and MINOR VICTIM 2 were located in another country and living in relatively poor conditions, he believed he could abuse them with impunity. Indeed, had the defendant not decided to distribute the images of MINOR VICTIM 1 being sexually abused after UCC-1 stopped producing for him, he very likely would have gotten away with this conduct. Whatever the reason—and given the difficulty in detecting these sort of crimes—it is imperative that the defendant and offenders like him understand that there are significant consequences associated with the sexual abuse of children.

Indeed, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'" *Irey*, 612 F.3d at 1211 (citation omitted). "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'" *Id.* (citation omitted); *accord United States v. Garthus*, 652 F.3d 715, 721-22 (7th Cir. 2011); *see also Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990) ("It is also surely

reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand.").

Distressingly, the market for child pornography has continued to grow, and to become more depraved, in recent years. *See, e.g.*, *U.S. Sent'g Comm'n Hr'g on the Child Pornography Guidelines* 1-2 (Feb. 15, 2012) (statement of James M. Fottrell, Steve DeBrota & Francey Hakes, Dep't of Justice), *available at* http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf. That depravity is evident here. The need for effective deterrence through a significant sentence is therefore essential. Indeed, as the Supreme Court has reasoned, "[t]he most expeditious if not the only practical method of law enforcement [to halt the exploitation of children] may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product." *New York v. Ferber*, 458 U.S. 747, 760 (1982).

A Guidelines sentence is additionally appropriate given the "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Smith v. Doe*, 538 U.S. 84, 103 (2003); *see also Cunningham*, 680 F. Supp. 2d at 855-56, 859-60 (discussing recidivism studies). There is little reason to think that the defendant is a "low risk" to recidivate. All of his perverse activities were carried out in secret, and it is clear based on the recovered chats that the defendant received pleasure from directing the sexual abuse of these children. He also minimized the gravity of his offenses in the interviews with FCPD, indicating that he had little concern for the harm that he inflicted on MINOR VICTIM 1 and MINOR VICTIM 2. And even if a defendant *could* be described as a "low risk" to recidivate, "[a] low risk is not the same as no risk." *Irey*, 612 F.3d at 1216-17. "Adequate protection is a function of two variables: the level of risk that conduct will occur and the level of harm that will be inflicted if that conduct does occur."

*Id.* at 1217; *see also Garthus*, 652 F.3d at 720 ("The sadistic nature of much of the child pornography consumed by the defendant is another reason to worry about his being on the loose."). Here, as detailed above, the harm inflicted by conduct like the defendant's is incalculable, and the sentence imposed should be designed to ensure it does not happen again.

"Nor does the fact that [the defendant] will be subject to restrictions and supervised release [if] he gets out of prison offer any guarantee that he will not commit any crimes." *See Irey*, 612 F.3d at 1215 (discussing studies and other data showing that "supervised release . . . often fails to prevent sex offender recidivism"). In short, "[s]upervised release is better than unsupervised release, but it does not offer society the level of protection from a convicted criminal that incarceration does." *Id.* at 1216.

Finally, while it seems likely that the defendant will be deported from the United States following his period of incarceration, this is cold comfort to MINOR VICTIM 1 and MINOR VICTIM 2, who face a lifetime of suffering and fear regardless of where the defendant resides and were victimized despite living in a different country. Deportation may mitigate the risk to children that results from the defendant's physical presence in the United States, but the same offenses could be perpetrated from nearly anywhere the defendant has an internet connection. Accordingly, the Court should impose a sentence adequate to deter the defendant from committing any further similar crimes, regardless of where he may reside in the future.

### D. The Need to Avoid Unwarranted Sentencing Disparities

A Guidelines sentence would also avoid unwarranted disparities and be sufficient but not greater than necessary to accord with the purposes of sentencing under 18 U.S.C. § 3553(a). Child sex offenders around the country routinely receive significant sentences for similar or less

aggravated crimes.[4] Among cases within this district, offenders similarly receive significant sentences for offenses involving the production of child pornography, and particularly production of child pornography involving young, prepubescent children. For example, in the case of *United States v. Scott*, No. 2:13-cr-164-RGD (E.D. Va.), the defendant was convicted of, among other very serious crimes, multiple counts of production of child pornography and conspiracy to produce child pornography based on evidence that he used online personas to lure women into sending him sexually explicit images of themselves and then successfully threatened some of these women into producing and sending him visual depictions of very young children engaged in specifically requested sexual acts. Following a jury trial, the Court sentenced the defendant to life imprisonment. *See id.*, Judgment, ECF No. 170 (Nov. 20, 2014).

Of course, what this Court is asked to decide is not what sentence was appropriate in other cases, but what sentence is appropriate for this defendant. The cited cases simply stand for the

---

[4] *See, e.g., United States v. Saunders*, No. 1:20-cr-362 (M.D.N.C. 2021) (50-year sentence for woman who produced sexual abuse material of children in her daycare facility for an online co-conspirator living abroad); *United States v. Castillo*, No. (W.D. Tex. 2021) (60-year sentence for 64-year-old defendant who traveled to Guatemala and filmed himself abusing a sleeping 13-year-old); *United States v. Regan*, No. 1:19-cr-21 (N.D. Tex. 2020) (90-year sentence for defendant who instructed his wife to produce visual depictions of herself sexually abusing three minors); *United States v. Faulkner*, No. 3:15-cr-101 (M.D. Tenn. 2018) (after remand, 47.5-year sentence for production and distribution of child pornography); *United States v. Schaffer*, No. 2:13-cr-183 (D.N.J. 2018) (40-year sentence for defendant who produced child pornography of two girls, 12 and 14); *United States v. Weaver*, No. 4:17-cr-57 (D. Mont. 2018) (41-year sentence for defendant who produced child pornography of his daughter and also trafficked in child pornography); *United States v. Day*, No. 3:15-cr-197 (M.D. Tenn. 2017) (50-year sentence for defendant who repeatedly produced child pornography of minor in his care, including one instance of mouth-to-penis contact); *United States v. Sedlak*, No. 6:15-cr-252 (M.D. Fla. 2016) (42-year sentence for defendant who produced child pornography of young child); *United States v. Kutej*, No. 4:14-cr-74 (N.D. Tex. 2015) (60-year sentence for defendant who produced child pornography of two minors); *United States v. Dowell*, No. 5:11-cr-45 (W.D. Va. 2013) (80-year sentence for non-parent's production of child pornography depicting two young girls).

proposition that a Guidelines sentence of 60 years' imprisonment is reasonable for this defendant. And as explained above, such a sentence would be well-deserved.

### III.    Supervised Release

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Under 18 U.S.C. § 3583(k), the authorized term of supervised release for the defendant's offense is at least five years and up to life. This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision over time. *See, e.g.*, H.R. Rep. No. 107-527, at 2 (2002) (explaining that "studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes" and that "the recidivism rates do not appreciably decline as offenders age"). Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, U.S.S.G. § 5D1.2(b) (Policy Statement), and the Fourth Circuit has observed that § 3583(k) and § 5D1.2(b) jointly "reflect[] the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *Morace*, 594 F.3d at 351 (citations omitted).

Based on an assessment of these factors, the United States requests that the Court impose a lifetime of supervised release with the conditions of supervision described in 18 U.S.C. § 3583(d) for felons required to register under the Sex Offender Registration and Notification Act and those described in U.S.S.G. § 5D1.3(d)(7) for sex offenders. A lifetime term of supervision is the only effective means to mitigate as much as possible the risk that he will reoffend, and also to provide him with steady access to the treatment and monitoring he will clearly require, if the defendant is

not ultimately deported. To ensure that the defendant is appropriately monitored if he should return following a deportation, the United States requests that the defendant be ordered to report to the U.S. Probation Office immediately upon his return to begin his lifetime term of supervised release.

## IV. Restitution

Pursuant to 18 U.S.C. §§ 2259 and 3663, as well as the plea agreement, the defendant must pay restitution in the "full amount of the victims' losses." PSR at ¶¶ 8-10, 43-44, 108; ECF No. 62, at 6-7. Pursuant to the plea agreement, the defendant also agreed that the Court may defer the imposition of restitution until after sentencing and to waive the requirement under 18 U.S.C. § 3664(d)(5) that the Court determine a final restitution amount no later than ninety days after sentencing. *Id.* No victim has submitted a restitution request to date; accordingly, the United States requests that the Court not render a judgment of restitution at sentencing and instead retain jurisdiction over it. Should the United States receive such a request, the government will submit it to the Court for consideration after due deliberation with the defendant, his counsel, and the victims or their representatives. *See generally* 18 U.S.C. §§ 2259, 3663A, 3664.

## V. Forfeiture

The United States will submit a consent order for forfeiture of the devices identified in the plea agreement and requests that the Court order such forfeiture as part of the judgment. *See* PSR at ¶¶ 9, 11.

## VI. Mandatory Special Assessment Under 18 U.S.C. § 3014

Under the Justice for Victims of Trafficking Act of 2015, the Court shall assess an amount of $5,000 per count of conviction on any non-indigent person convicted of the crimes in this case. The United States currently has no evidence indicating that the defendant has assets. The United

States therefore requests that the Court impose a special assessment under this statute, should the Court determine that the defendant is non-indigent.

## VII.    Mandatory Special Assessments Under 18 U.S.C. §§ 2259A(a)(3) & 3013

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act. The Act instructs that, in addition to any restitution or other special assessment, courts "*shall* assess (1) not more than $50,000 on any person convicted of a child pornography production offense." 18 U.S.C. § 2259A(a)(3) (emphasis added). Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* §§ 2259(d) & 2259B, and shall be paid in full after any special assessment under § 3013 and any restitution to victims of the defendant's offense, *see* § 2259A(d)(2). In determining the amount to be assessed under § 2259A, courts should consider the sentencing factors set forth in § 3553(a) and the guidance in § 3572 for the imposition of fines. § 2259A(c).

Given the gravity of the defendant's extensive offense conduct, the United States respectfully requests that the Court impose a reasonable special assessment under this statute, in addition to the $200 mandatory special assessment for his felony convictions pursuant to 18 U.S.C. § 3013.

## <u>CONCLUSION</u>

The defendant is a sexual predator. For the reasons stated herein, the United States respectfully requests that the Court impose the Guidelines term of incarceration of 720 months, a lifetime of supervised release, restitution, forfeiture of the defendant's electronic devices, a special assessment under 18 U.S.C. § 2259A, and a $200 special assessment under 18 U.S.C. § 3013.

Respectfully Submitted,

Raj Parekh
Acting United States Attorney

By:     <u>  /s/                                  </u>
                  William G. Clayman
                  Special Assistant United States Attorney (LT)
                  Jonathan S. Keim
                  Assistant United States Attorney
                  U.S. Attorney's Office
                  2100 Jamieson Avenue
                  Alexandria, Virginia 22314
                  Tel: 703-299-3700
                  Fax: 703-299-3981
                  Email: william.g.clayman@usdoj.gov
                  Email: jonathan.keim@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 28, 2021, I electronically filed a redacted copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to counsel of record in this case, and sent an un-redacted copy of same via electronic mail to counsel of record.

I further certify that on July 28, 2021, I sent a copy of the foregoing via electronic mail to the U.S. Probation Officer assigned to this matter:

Kelly Smihal
United States Probation Office
Email: Kelly_Smihal@vaep.uscourts.gov

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By:      /s/
William G. Clayman
Special Assistant United States Attorney (LT)
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Email: william.g.clayman@usdoj.gov